Your Honor, this case on the docket, 2-17-0216, is between the marriage of Suzanne A. Anders, Petitioner-Counter-Respondent-Appellee, and Brian S. Anders, Respondent-Counter-Petitioner-Appellant. Arguing on behalf of the Respondent-Counter-Petitioner-Appellant, Mr. David C. Brown. Also arguing on behalf of the Respondent-Counter-Petitioner-Appellant, Mr. David I. Adams. Arguing on behalf of the Petitioner-Counter-Respondent-Appellant, Mr. Paul J. Marshall. Good morning, Counsel. Good morning, Your Honor. Mr. Grund? I have a question. Yes, you may. I do notice that in one way or another, this panel is responsible for distilling the issue of whether profits from a corporation are either a non-marital corporation or either marital or non-marital, and also distilling the laws that pertains to this issue. The only distinction that we have here that I believe that was misapprehended by the trial court was a fact that instead of or akin to retained earnings, not instead of, but akin to retained earnings, the profits of the company were paid out as bonuses as opposed to being kept in retained earnings. Now bonuses as they were paid out, Mr. Grund, were those based upon efforts? Yes. And when I said paid out, in the form of payment of a bonus, but the bonus was never paid out. In fact, the money for these bonuses never left the company. But they were still the property then of your client, even though they weren't paid out. Well, actually not. Because what happened in this case, Your Honor, let me draw an analogy here. Retained earnings is a liability. It's in the liability section. It's used for working capital, it's used for acquisition of machinery, equipment, inventory, and generally running the company. Unless it's severed, unless the profits of the companies are severed and paid to the shareholder, and that shareholder has control of the distribution of those profits, then that profit that's distributed and severed from the company is deemed a marital if and only if the marital estate is not adequately compensated. So it's your position that none of these retained earnings throughout the marriage of these two individuals, none of these retained earnings were ever dipped into to assist them in their everyday life? Correct. But for the distinction without a difference that they were paid out as bonuses, as in Samarja, as in Samarja, rather than being held by retained earnings. But in Samarja, the bonuses were only given to the stockholders, and they weren't based on employment. That's different here, because the fathers, who were no longer stockholders, got paid bonuses as well. So why should Samarja govern here? Well, but Samarja really dealt with a shareholder. It doesn't matter what bonuses a company pays to its employees, whether they be for efforts, in this case, or whether they be for an equity portion or a distribution from the profits as a bonus. The father who ran the company was not a shareholder, and he, in fact, received money for his efforts for running the company. He was, as the judge suggested, and he suggested, he was the boss controlling that cash register, as he described it, with all of these drawers. Well, but it does matter, doesn't it, in terms of how we're to look at this, if we're going to look at it as retained earnings or not? So doesn't it matter who they were paid to and how they were treated? I think, you know, the economic reality is that this was a mom-and-pop operation, and they had a 40-year history of payment of bonuses instead of shareholder distributions. And instead of classifying those profits retained earnings and keeping them in the company, they were classified as loans for two reasons. Principally, one, to affect an estate plan that would call upon the parent, in each case, two generations, the parents, to transfer their stock from grandpa to dad and then to my client, his son. And that was a 40-year history of what occurred here. These people never, despite the fact that they had a line of credit, they never borrowed from a bank. In fact, the best evidence of the use of these funds that never left the company is this fact. I believe, if I'm not mistaken, there was $119 million of assets that the company controlled, owned, and worked with. But on the other hand, of the $119 million, only $2 million was their equity position. That was testified to by Mrs. Ander's expert. Counsel, why don't we talk about the notes payable accounts? The notes payable, note payable accounts? Sure. How were those funded? Did the bonus monies go into those notes payable accounts, and didn't Brian have access to that note payable account and able to take money out of that as he wished? Well, actually, his brother, I guess. The answer is he had access only by permission. He didn't have control over that. But the monies were paid out of that. I'm sorry? The monies were paid out of that account. A small fraction of the funds that were generated from the profits of the company were used to pay taxes for Brian and were used in small measure as loans to support his lifestyle. And so when the bonuses were paid, where were they placed? Did they not go into the notes payable account? The bonuses were booked. Paid on the books, but they were booked to the notes payable account, correct? Here's what occurred, if I may. A check was issued for the bonus amount, for all the profits. To who? 25% of whatever they decided it was going to be, but generally it was 25%. And who was it issued to? Yes. Who was the check issued to, Counselor? I'm sorry? Who was the check, bonus check issued to? Okay. The bonus check was issued to Brian and then torn up by the controller of the company. A credit was given to Brian for the loans payable account. A debit was made for the taxes that were paid at the time. And then the loan payable account was used to fund the operations of the company. And to allow monies to be taken out by Brian and to his siblings.  But regardless of whether it was the purpose, that's in fact what happened, isn't it? I'm sorry. I said even if it wasn't the intended purpose, that is in fact what happened. No, only in small measure. Or small measure or no measure. It's a bit like being a little bit pregnant. Either you're taking the money out or you're not taking the money out. Only the money that's severed. And that is clearly a factor to be. The money has to be severed from the company. So only the money that was taken was marital funds. Not all of it. The profits of the company always remained in the company. They never left. $117 million of the $120 million in profits was left in the company. $3 million was removed. This is hard-cold fact. $3 million of that $120 million in assets was there for equity, owner's equity. And all that Brian had from this loan payment account, it wasn't his money. It was the assets of the company. But weren't they a liability? So how could they have been assets of the company? Good point. And you're right. They were liabilities. Brian was only a creditor of the company. Because the company owed him X amount of money. He was a shareholder and a creditor. Yes, he was a shareholder and a creditor. So the cases Joynton and Lundahl, in those cases, the costs, the courts found that the retained earnings were part of the corporate assets. Here, Durable's loan from the shareholders wasn't a corporate asset. It was a liability. So how did those cases instruct us then? Well, let's look at the financial statement. The assets of the company for $120 million included machinery, equipment, cash, some cash, inventory, and other operating expenses. That's other money used for operations. That's $120 million in assets. Now, instead of Durable, the company, going to the bank and borrowing the money, it was kept in the company in the form of loans payable to the shareholders. They became creditors. So we've got $120 million. Now, the second part is the liability portion. The liability of the company to the shareholders. They're creditors. In the event of a dissolution of this company, should this company fail, they would never have received the totality of these loans because the company would be bankrupt. And, in fact, there was only $2 million in equity. But as the court knows, when you're liquidating a company and you're liquidating machinery and equipment and inventory, you're maybe getting 20 cents on the dollars. So 80% of those loans, of the $117 million that's owed to them, 80% of that, so roughly $100 million, would be lost. And so it's really a distinction without a difference simply because. Do we look at the value of the company at the time of the divorce or the dissolution, or do we look at the value of the company down the road when it's going to be sold, albeit by death, bankruptcy? When do we look at the value of the company? The value of the company, as testified, was about $1,700,000 total. So that was the only equity, and it was done on a net asset approach. I cross-examined the fine expert here, and it was $1,700,000 for a reason. Because when you transfer stock from a parent to a child, there is a gift tax involved. And the idea is to reduce the gift tax and not to be able to pay gift tax. I'm sorry. Can we get into maintenance today? Well, no, we didn't, but we still have time on the rebuttal. And the idea behind it is. . . If you want to finish your sentence, counsel, then you'll. . . And the idea behind the tax plan that took place was if you paid it in the form of a bonus and the shareholder became a creditor of the company, then you would reduce the value of the shares below that $10,000 line where the gift tax applies. And that's how they were able to. . . Dad was able to. . . to my client without paying gift tax. Thank you, counsel. It's a very, very common tax planning device. Thank you, counsel. Your time is up. You'll have time on rebuttal. Thank you. Mr. Bargill. Thank you, Your Honor. May I produce a court? Distinguished counsel. They've used their time. Oh, I'm sorry. Excuse me. Did you have your. . . Okay, I apologize. I thought the whole. . . that they were dividing. I apologize. There are two minutes for Mr. Adams. Would you be kind enough? It was my mistake. I interpreted the buzzer as their entire time was up. It's not. They have two additional minutes. I'm sorry, sir. That's fine, Your Honor. Okay. Do you mind being seated for a minute and let them finish? And then they have rebuttal. It's my mistake. I'm sorry. Thank you. Okay. Mr. Adams, thank you for letting me know. Craig. Oh, no. No. Again, I apologize. As we've only got two minutes. Oh, no, no. It's no problem at all, Judge. Go ahead. I would just want to make a couple quick notes here with respect to the maintenance issue. Obviously, should you agree with us with respect to the property issue, on demand a new maintenance hearing would be required and the entire issue would end up being mooted. But that being said, there are still some certain issues. One of the points that I wanted to emphasize in the briefs was that I believe that the problem is that the courts focus on these bonuses and the fact that it's sort of ignored that's, you know, not ignored, but it was sort of led astray from the very basic concept that maintenance is need-based and it's based on their actual standard of living. And as Mr. Grunt explained here, those bonuses, that money, remain inside the corporation and were never actually used to fund their standard of living. And so that was one problem. A lot of their standard of living was funded by the payment of the credit card, too, correct? Right. And that, of course, was taken into account, the $230,000 in salary, which was, I believe, it was around $170,000, and then you had about $60,000 or so from the American Express. And that, of course, is all very properly considered as part of Brian's income. There was never any skew as to that. But as to Suzanne's expenses as part of the basis for this maintenance award, your objection to her figure, you object to the figures that she used, but your own expert came up with just about the same figures. So why is there an objection? Well, because I think of the double-dipping issue that I brought up in the briefs here, and that is, in the judgment, the court ordered, quote, for Brian to pay for all the children's expenses, including extracurricular activities, medical insurance, uninsured medical, dental, optical, psychological expenses, school registration, school expenses, summer camp, private and group lessons, and sports club activities. And part of those of the expenses that she includes on that affidavit are $9,000 in child expenses. And so it's double-dipping for that affidavit to be used as the predicate for her child support award, yet to also award Brian, but now she's relieved of those expenses that were in that affidavit. And now Brian is having to place that, and yet the court gave no credit for the fact that it required him to pay for all of those other expenses. Do we have questions?  Okay. Thank you very much, Your Honor. I thank you, and I rely on our briefs to the extent of the rest of that issue. Thank you, Your Honor. Okay. Now Mr. Bergio. Thank you, Your Honor. May it please the Court, again, my name is Paul Bergio, and along with Shoska Dice, who was one of Suzanne Anders' trial lawyers, I represent the appellee, Suzanne. I would like to cover just a handful of points this morning. The first is that the bonus Brian receives is for his personal efforts on behalf of Durable. Scott Anders, Brian's brother, and the president of Durable, says that the bonuses are performance-based. That's in the record. That's his testimony. Gary, Brian's father, said you get more money if you've done a good job, and you get less money if you've been slopping off. That's another indication that the bonuses are performance-based. Does it matter if the bonuses are performance-based? I'm sorry? It doesn't matter that the performances are performance-based? It does make a difference. Apparently Mr. Grund disagrees with that. I said apparently Mr. Grund disagrees with that. Well, I respectfully disagree with Mr. Grund. I think as one of the justices pointed out, that's a significant factor in Samarja, okay, that the bonuses are income. That's one of the reasons that the Samarja positioning was decided the way it was. So the fact that these are performance-based are an indication that they have to do with the job you're doing as opposed to some gracious gift from the corporation. Cory, who is Brian's cousin and vice president of sales at Durable, also says we're evaluated on their performance. And Richard Edelheit, Durable's accountant, said Gary, who is Brian's father, and Dennis, who is Brian's uncle, perceive performance-based bonuses. I think we can all agree that everyone says that they're performance-based. But let's talk about the fact that these monies went back into the payables and that they were not net income or income to the husband. Well, they were income, as the court pointed out. They were declared W-2 wages to the employee. Taxes were paid on those bonuses. But the bonuses were, in turn, lent back to the corporation. Now, the fact that they may never have taken that check and cashed it and wrote a new check, I think, is immaterial. The consequence is still the same. That's what they did. And I was going to cover this a little later, but I think it's relevant here. The fact, too, is that this was their money. Whose? I'm sorry? This was Brian's money. This was his brother's money. This was his cousin's money. This was his father's money and his uncle's money, the money in the most payable account.  If you take a look in the record at the SEC 1241 V-9, there's a schedule with the bonuses and who took what from the bonuses over the years. It shows that Brian from 2008 to 2015 took a little over $3 million of his bonuses. I'm sorry, from the most payable account. Scott, his brother, took $3.2 million. Darren, his cousin, took $2.9 million. Cory, his other cousin, took over $4 million. But, counsel, isn't it also important that the company had use of the funds in this loan's payable account for its operations? And doesn't that make it like retained earnings, and isn't that what we should be looking at? No, I respectfully disagree with this. Why? Because, number one, I think if you take a look at their balance sheet, they have a retained earnings account, number one, in addition to the most payable account. There's about $2.9 million in the retained earnings account, and I don't know what it is, $29 million, I think, in the most payable account. The other thing is that the retained, I'm sorry, the most payable account, if you take a look, increases over time. From the first time that it's mentioned in the case, it's three times what it was ten years ago. So whatever they're using it for doesn't seem to be terribly costly, or maybe that money actually comes out of a retained earnings account that they have because the most payable account continues to grow. The other reason that it's not retained earnings, and most significantly the reason that it's not retained earnings, is because it is not an asset of the corporation. Retained earnings are an asset, as has been pointed out by the cases and accounting principles, and it's clear that the most payable account or loans to shareholders, whichever you prefer, that's a liability of the corporation. Elhite, who was the Durable Corporation accountant, himself says that this is a liability of the corporation. So no, they're not like retained earnings. Why is it non-marital property? I'm sorry? Why is it non-marital property? He received that as a gift. It's not non-marital property, Your Honor, for two reasons. The primary reason is because it comes about as a result of his personal efforts, not as a result of, as I said before, some kind of gracious gift or something like that. It's income. They've also tried to say that this is like a dividend. Well, it's not like a dividend. It's not like a dividend because it's pretty clear that these bonuses go to individuals who work for Durable, Brian's father and his uncle, who are not shareholders of the company. They get bonuses every year, too. So if they're getting bonuses, you can't call the bonuses dividends. Was this an S corporation? I'm sorry? This is an S corporation, right? I believe. The other thing which is true, too, is Brian, his brother and two cousins are each 25% shareholders of Durable. Now, in any corporation that I'm aware of, when dividends are issued, each shareholder gets the same amount of dividends as the other shareholders who get the same amount of stock. So each one of these four shareholders, as 25% owners, should get the same amount of bonus. And yet it's clear. If you take a look at the bonuses year in, year out, which, let's see, there's another section. The bonuses are different. You know, for instance, a point was made of the fact that Brian, the appellate in this case, one year got a $65,000 bonus while other members of Durable were getting six and seven figure bonuses. When asked why that was, it was said because it was to motivate him to come to work more, that he was not doing his job as it were. But the significant thing is that if he was a 25% shareholder and this was a dividend, it wouldn't make any difference whether he's coming to work more or not. If it was a dividend, he'd be entitled to the same dividend that every other 25% shareholder was. But, you know, it isn't, and that's why he didn't get it. Counsel, with respect to maintenance, I have a question I want to ask. In returning the appropriate amount of maintenance, why shouldn't the trial court have considered the amount Suzanne was getting for her property settlement that certainly would have generated income for her? It was over $5 million. And in light of the statute of 750 ILCS 5-503810's provision  Why shouldn't the trial court have considered that? Well, I think in response to your honor's question, I think that the trial court, excuse me, did consider it. They considered it in the sense that it said this is a situation that Suzanne is in now. Okay, she's a 41-year-old woman. She's reasonably healthy. She's got two young children. Over the course of time, she'll be able to go to work. She's never made more than, I don't know what it was, $10 an hour in the time that she has worked. She's unable to serve and to support herself. In addition to that, the law is pretty clear that a maintenance recipient is not obligated to divest herself of assets which have been awarded to her in the judgment for dissolution of marriage in order to maintain herself when the maintenance-paying spouse has sufficient income to do that. If you take a look at it, $16,000 a month is a drop in the bucket to Mr. Anderson. He had received in his settlement double the amount she received, correct? Yeah, absolutely correct. Out of the $15 or $16 million, he got 10-plus and she got a little over 5. The other thing I wanted to say, too, in response to what Mr. Adams said, is that when he says that, well, look at Mr. Anderson. He's got to pay these additional costs for the children and so on. If you take a look at the judgment of the court, which I think if you read the judgment, and I'm sure you have, I mean, it's very well thought out. You will find that the court did not award Ms. Anders, my client, did not award her any child support. What she got was maintenance, which encompassed children's costs as well as anything. So there was no double-dipping here. And I think the court was well aware of the fact that Mr. Anders was in great position to make these kinds of payments. There was no problem with him at all. So I think I've covered... Can I ask you a question, sir? Absolutely. This was not guideline maintenance, correct? No. Because it was over... Over the 250 threshold at the time. So what amount of money did the court base the maintenance on? Well, basically an amount in excess of $250,000. Do you know the dollar amount in excess of $250,000? Well, I don't believe that there is a provision where the court said, okay, this is the number of dollars that I'm going to be expensing. I think what the court did, and I say again, I thought it was very thoughtful, I think what the court did was take a look at the financial circumstances of the parties, take a look at the fact that this guy's got over $10 million in his... which he can access any time he wants. And by the way, there is a provision in the corporate bylaws which obligates the corporation to pay these monies to the individuals. I mean, this is not a if we will or we want to, we will, and if we don't, we won't. But I think the court considered that. I mean, his annual income, which according to him is $230,000, plus the amount of bonuses that he gets on an annual basis, which are accepted at $65,000 a year, are generally high six figures and even seven figures. There wasn't one year where all four 25% shareholders received 5. This is in the last seven or eight years, $5.3 million each, each. So I think the court took all of that into consideration in fashioning its point, and it did as I believe your Honor said, it said, listen, her $13.31 says she needs $16,600 and some dollars. Their expert, which they say in their brief was the only expert who testified in the case, said $17,000 is what it would take. So under those circumstances, it seems to me the award that was given is certainly reasonable. Now, there's one more point I want to make before I sit down. The appellate here, as the court well knows, has to meet a standard in asking this court to reverse the judgment. The standard has to meet is either manifest way to the evidence, the decision is against the manifest way to the evidence, or there's an abuse of discretion. I think the evidence overwhelmingly supports on every aspect the conclusion that the court came to, but it certainly can't be said to be against the manifest way to the evidence. And I think with regard to abuse of discretion, I don't think any reasonable person could say the trial judge was wrong in terms of what she did. So if the court has no further questions, I would simply ask the court to affirm the decision in its entirety. The maintenance guidelines were $250,000 at the time. There's an increase now to $500,000, correct? That's correct. And the maintenance guideline, if this were $250,000, would have been what, $5,000 a month? I didn't calculate that out. So there's a large discrepancy between the $250,000 guideline and what was given here. Correct. But there's also a large discrepancy between a party earning $250,000 a year and a party earning a million dollars a year. I mean, that's what explains the discrepancy, if you will. But I think that's why I asked you at the beginning, what dollar amount did she base the maintenance on? She based the maintenance on, I believe, McLean's 13.31, because she talks about that in her judgment. And she based it on, gosh, I can't even remember his name now. Their expert's determination that $17,000 was not a good cut. And that's, I believe, that's more than sufficient evidence to satisfy the manifest way to the evidence standard. I think she did something. Well, if I could just say what I was told. My co-counsel says that there was no $250,000 threshold in effect at the time that the judgment was actually entered. I'm sorry, that the judgment was what? At the time the judgment was actually entered. Okay. I would say, though, regardless of that, I mean, there is no way that this is inappropriate or incorrect. Thank you. Thank you, Mr. Duggan. Mr. Grund? We had a compensation expert that was presented to the court for his consideration. Mr. Riley, he was a compensation expert that was admitted as a person whose opinion was readily available and qualified to render an opinion by the court. He testified that the total salary received by, total monies received by my client was $230,000, 90 of which was money that was advanced to him by the company for charges that he made on the company express card. He determined, based upon an analysis of equally situated employees in similar companies, that Brian, my client, fit into a category that represented anywhere between, I believe, 50 and 75 percent of those other individuals who did the same kind of job that Brian did. He didn't have any agreement with respect to the distribution of profits, even though he was entitled to 25 percent of the profits from the company. Number one. Number two, the question... Well, is that dispositive, the agreement that he had, as opposed to what actually happened? He never had any agreement. You said there was no agreement, but I'm asking, is that the fact of whether he had an agreement or not dispositive, as opposed to what actually happened in terms of his... He was paid $230,000. That's what he removed from the company for his labors. That's what he received. He didn't remove it. He received that. He received that for his labors. That's correct. But in terms of the support issue, our expert, the only expert, again, who testified in this, legal, CPA, lawyer, did some work on this case as well. He determined from a three-year study preceding the separation of the parties that the household expenses were $3,800 total. As best he could, he removed, I guess, Brian's expenses. Suzanne's expenses were $4,000 directly attributable to her. The rest of those expenses were child-related expenses, $9,250. $17,000 was the totality of those expenses. The trial court ordered that my client pay all of the child's expenses, but for basically the food that he takes in when he's with his mother, and I believe they have almost a 50-50 parenting plan. But there's no child support here. There's no child support, correct. And there shouldn't be because he's paying for all of those expenses, and the obligation for child support is that of both parents. So the maintenance, when determining the maintenance, the court took into court the expenses of the children as well? Yes. Is that what the court typically does in a maintenance distribution? Oh, sure. Well, I don't know if that's typically done. I don't think it's typically done, no. No, it isn't. And so, but in this case, it was used to assess the maintenance. No other amount could be assessed because Suzanne, Mrs. Andrews, I shouldn't be calling her by her first name, and I apologize to her. That was her affidavit as well, that her needs included the children's needs. And so she came up with $17,000, although I must admit, during the trial, attorneys across the family, there were guesses that she testified as estimates and equated the two, frankly. And there were many, many issues with respect to her statement. But given its best case, given looking at it in the light most favorable to her, it could have been more than $17,000, and it wasn't $17,000. One more thing, if I may add. Very briefly, counsel, I'm sorry, we've got five cases today. Okay. We don't have as much leeway if it's essential to your case. I thank the court. Thank you very much. Thank you very much. Thank you very much, counsel, for your arguments today. The court will take the matter under advisement and render a decision in due course. We stand in brief recess until the next case. Thank you.